**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-1533-WJM-MJW

656 LOGAN STREET CONDOMINIUM ASSOCIATION, INC.,

    Plaintiff,

v.

OWNERS INSURANCE COMPANY,

    Defendant.

---

## ORDER GRANTING DEFENDANT'S SUMMARY JUDGMENT MOTION AND TERMINATING CASE

---

This is an insurance coverage dispute. Plaintiff 656 Logan Street Condominium Association, Inc. ("Plaintiff"), sues Defendant Owners Insurance Company ("Defendant") based on Defendant's refusal to cover losses allegedly resulting from a June 2015 hail storm. Currently before the Court is Defendant's Motion for Summary Judgment. (ECF No. 56.) For the reasons explained below, the Court grants this motion and will enter judgment in favor of Defendant.[1]

### I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the

---

[1] As a consequence, Defendant's Motion to Limit the Testimony of Howard Altschule Pursuant to F.R.E. 702 (ECF No. 80), as well as Plaintiff's Motions in *Limine* (ECF No. 91), which are still in briefing, will be denied as moot.

relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to a party or otherwise noted.

## A. The Property and the Two Hail Storms

"The 656 Logan property ['Property'] is . . . a single three-story residential building containing nineteen condominium apartments. The building is covered with a smooth-surfaced polymer-modified bitumen roof membrane that has been painted with a reflective silver-colored coating." (ECF No. 69 at 14.)[2]

A hail storm struck the Property on June 24, 2015. (ECF No. 56 at 4, ¶¶ 3–4.) The parties dispute the size of the hail. Plaintiff claims the storm produced hail of up to two-and-a-half inches in diameter at the Property. (ECF No. 69 at 9, ¶ 1.)[3] Defendant

---

[2] This quotation is not contained in any parties' statement of material facts, but no party contests it either. The Court includes it here for context.

[3] Defendant's Rule 702 motion (*see* n.1, above) seeks to exclude the testimony of

claims that the hail stones were approximately one inch in diameter. (ECF No. 56 at 8, 11, ¶¶ 31, 43; ECF No. 73 at 2, ¶ 31.)

Slightly more than a year later—on June 28, 2016—another hail storm struck the Property. (ECF No. 56 at 4, ¶¶ 4–5.) The hail stones were approximately one inch in diameter. (*Id.*)

**B.      Inspection for Hail Damage in Early 2017**

A new property manager, HOA Simple, began servicing Plaintiff and the Property on January 1, 2017. (ECF No. 56 at 5, ¶ 13.) HOA Simple was, at that time, also managing a similar condominium building less than a mile from the Property. (*Id.* ¶ 15.) HOA Simple had previously filed an insurance claim for hail damage on the other condominium building arising from the June 2015 storm. (*Id.* at 6, ¶ 16.) HOA Simple decided, based on proximity, that if the June 2015 storm damaged the other building, it probably damaged the Property. (*Id.* ¶¶ 18–19.)

HOA Simple hired a contractor, LR Contracting, to inspect the Property's roof in February 2017, and the contractor reported hail damage. (*Id.* ¶ 20.) On March 14, 2017, Plaintiff hired C3 Group as its public adjuster to assist it in filing an insurance claim. (*Id.* ¶ 21.) C3 Group and LR Contracting then "had conversations regarding which date of loss to choose for the . . . hail claim," with the two candidates being the June 2015 and June 2016 storms. (*Id.* at 7, ¶ 22.)

Defendant was Plaintiff's property insurer from December 30, 2014 through December 30, 2015. (*Id.* at 3, ¶ 1.) A different insurer covered the Property in 2016.

---

Plaintiff's expert who will opine about the size of the hail. Because Defendant is entitled to summary judgment even if the Court admits the expert's testimony, the Court need not resolve the Rule 702 motion first.

(*Id.* at 11, ¶ 45.)   Through some process (not obvious in the record), C3 Group and LR

Contracting elected to make a claim for the June 24, 2015 storm, meaning a claim on

the policy issued by Defendant.  Accordingly, on April 5, 2017—about twenty-one

months after the June 2015 storm—Plaintiff submitted a claim to Defendant for hail

damage caused by that storm.  (*Id.* at 7, ¶ 24.)

## C.    Defendant's Initial Investigation

Defendant assigned a claims coordinator, Mr. Daniel Fossen, to Plaintiff's claim.

(ECF No. 69 at 10, ¶ 8.)  Fossen received from C3 Group a report of weather data for

the evening of June 24, 2015.  (*Id.* ¶ 9.)  The report purports to document hail falling at

the property on that date, with a maximum size of two-and-a-half inches.  (ECF No.

69-6.)

Fossen inspected the Property's roof on May 15, 2017.  (ECF No. 69 at 10, ¶ 10.)

He identified hail damage that, in his view, was serious enough to merit roof

replacement.  (*Id.*)  In a May 20, 2017 inter-office memorandum directed to the "home

office," Fossen memorialized his findings, preliminarily estimated that replacement cost

was $72,000, and recommend releasing at least the actual cash value of about

$41,000.  (ECF No. 69-4 at 1–2.)  He further stated that he would "continue to work with

[C3 Group] in attempts to come to an agreed scope [of work]."  (*Id.* at 2.)  A claims

examiner at the "home office" responded to Fossen on May 30, 2017, in an e-mail

stating, among other things, "We should be hiring an engineer to determine if we can

conclusive[ly] determine if there is old versus new hail damage."  (ECF No. 73-3.)

In a letter dated May 31, 2017, Fossen informed Plaintiff that Defendant was

"continu[ing] to investigate [the claim] under a reservation of rights.  We are reserving

our rights to afford coverage for this loss under your policy due to potential issues with a

delay in reporting the loss."  (ECF No. 56-1 at 155.)  The letter went on to quote various potentially applicable portions of the policy, including the requirement that the policyholder "[g]ive us [*i.e.*, Defendant] prompt notice of the loss or damage."  (*Id.* at 156; *see also* ECF No. 56 at 3, ¶ 2.)

On June 8, 2017, Defendant's retained engineer, Mr. William Templeton, inspected the Property.  (*Id.* at 10, ¶ 41.)  He observed hail damage on the roof and concluded it most likely came from the June 2016 storm.  (ECF No. 56-10 at 21.)  His conclusion as to timing was based on weather data stating that all the hail events since 2015 produced hail of approximately one inch in diameter, meaning it would be difficult to distinguish between damage caused by one storm or another, "[s]o it was just a logical conclusion . . . that the most recent was the likely candidate."  (*Id.* at 31; *see also id.* at 20.)

### D.    This Lawsuit

Plaintiff filed this lawsuit on June 23, 2017.  (ECF No. 1.)  During discovery, Defendant propounded to Plaintiff the following interrogatory: "State when and how YOU learned of YOUR LOSS related to the hail storm occurring on June 24, 2015." (ECF No. 56-7 at 5 (capitalization in original, indicating defined terms).)  In a response dated January 19, 2018, Plaintiff, through its Rule 30(b)(6) representative, Ms. Molly McDonald, answered, "To the best of information and belief, [Plaintiff] discovered its loss related to the wind and hail storm shortly after its occurrence on June 24, 2015." (*Id.*; ECF No. 56 at 9, ¶ 32 & n.4.)

Defendant also propounded a request for admission seeking similar information: "Please admit YOU were not aware of any LOSS caused by the INCIDENT until YOUR public adjuster (C3 Group, Inc.) informed YOU of such LOSS."  (ECF No. 56-7 at 12.)

In the same January 19, 2018 response to the interrogatories, Plaintiff, through McDonald, responded to this request for admission with, "Denied." (*Id.*)

On March 2, 2018, Plaintiff served amended interrogatory responses. Concerning the interrogatory discussed above, Plaintiff, through McDonald, amended its response as follows: "To the best of information and belief, Plaintiff discovered its loss related to the wind and hail storm shortly after its occurrence on June 24, 2015.  Plaintiff does not recall how it learned of the loss." (ECF No. 56-8 at 4.)

McDonald was deposed on June 19, 2018.  Defendant's counsel asked McDonald whether the amended interrogatory response was "your position today." (ECF No. 56-11 at 26.)  McDonald responded, "No.  I wasn't—we were unaware of any loss related to the hailstorm until we had [a] professional opinion." (*Id.*)  She then volunteered, "I think I was a little confused about the question itself." (*Id.*)  As for the request for admission in which McDonald denied that the information from C3 Group was the first Plaintiff knew of hail damage, she said she did not remember making that denial. (*Id.* at 28.)

Plaintiff has never amended its March 2, 2018 amended interrogatory response or its January 19, 2018 request for admission response. (ECF No. 73 at 19.)

### III.  ANALYSIS

As noted, Plaintiff's policy from Defendant required "prompt notice of the loss or damage." (ECF No. 56 at 3, ¶ 2.)  Defendant's primary summary judgment argument is that (i) Plaintiff failed, as a matter of law, to fulfill the "prompt notice" requirement, and therefore (ii) coverage is excused. (ECF No. 56 at 14–21.)  The Court will address each argument in turn.

**A.   Did Plaintiff Fail to Fulfill the "Prompt Notice" Requirement, as a Matter of Law?**

A prompt notice requirement in an insurance policy "means that notice must be given within a reasonable length of time under the circumstances." *Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 226 (Colo. 2001).  In the property/casualty insurance context, the duty to give notice "arises when an insured, with reasonable diligence, can ascertain that the [the property has been damaged by a covered event]." *Id.*[4]

Plaintiff's early written discovery responses stated that Plaintiff knew of its damage shortly after the June 2015 storm.  (*See* Part II.D, above.)  Defendant insists that Plaintiff must be held to these responses, and that Plaintiff's backtracking during McDonald's deposition must be disregarded.  (ECF No. 56 at 19; ECF No. 73 at 12.)  Defendant analogizes to the sham affidavit doctrine, *i.e.*, that "courts will disregard [an affidavit contrary to deposition testimony] when they conclude [after weighing certain factors] that it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).  The situation here is closer to the reverse: deposition testimony contradicting a prior affidavit—although in this case, it was not a

---

[4] Citing to *Sunflower Condominium Association, Inc. v. Owners Insurance Co.*, 2018 WL 2196089 (D. Colo. May 14, 2018), *appeal docketed*, No. 18-1478 (10th Cir. Dec. 17, 2018), Defendant argues that the question is what a reasonable property manager would have done under the circumstances.  (ECF No. 56 at 18.)  *Sunflower*, a hail-damage insurance case like this one, indeed speaks of "a reasonably diligent property manager," 2018 WL 2196089, at *7, but not as a legal standard.  The question in that case was whether an e-mail from a contractor noting hail damage could have been ignored by the property manager, and the Court answered the question in the negative: "in the Court's view a reasonably diligent property manager would have read the e-mail at the time it was received." *Id*.  Thus, under the facts of the case, it was appropriate to look at the property manager's actions.  Here, the Court could likewise look specifically at the pre-2017 property manager's actions, but the Court finds that unnecessary under the straightforward facts of this case.

prior affidavit but written discovery responses.[5]

Defendant does not cite, nor could the Court locate, any authority for this "sham deposition" variant on the sham affidavit rule. That said, the principles governing the sham affidavit rule conceivably apply to the present situation. In particular, the requirement that the about-facing party provide a plausible explanation for its about-face reflects the need to prevent parties from changing their stories out of expediency. *See Genberg v. Porter*, 882 F.3d 1249, 1263–64 (10th Cir. 2018). Here, McDonald provided no explanation other than a brief, generic reference to confusion (ECF No. 56-11 at 26), but neither she nor her counsel has ever provided a plausible explanation for this confusion. The question was simple: "State when and how YOU learned of YOUR LOSS related to the hail storm occurring on June 24, 2015." (ECF No. 56-7 at 5.) The Court cannot perceive how McDonald was *twice* confused about this question: once in her initial response, and once in her amended response.

Nonetheless, the Court need not resolve whether the sham affidavit doctrine may extend to the "sham deposition" context, nor whether the doctrine would prevent Plaintiff from reversing its position in these circumstances. The question of reasonable diligence in reporting an insurance claim is an objective one. *Clementi*, 16 P.3d at 226. Here, Plaintiff insists that the hail stones falling on June 24, 2015 reached sizes of two-and-a-half inches in diameter. Accepting Plaintiff's (*i.e.*, the non-movant's) version of

---

[5] Plaintiff attempts to distance itself from its written discovery responses, repeatedly noting that they were "unverified." (ECF No. 69 at 6, ¶¶ 32–35.) But a party may not fail to sign an interrogatory response and thus avoid being bound by it. "The person who makes the answers *must* sign them . . . . " Fed. R. Civ. P. 33(b)(5) (emphasis added). This Court could treat failure to sign as failure to answer, and in turn infer that the answers would have been unfavorable. *See* Fed. R. Civ. P. 37(a)(4), (b)(2)(A)(i). *Cf. Saria v. Mass. Mut. Life Ins. Co.*, 228 F.R.D. 536, 538–39 (S.D. W.Va. 2005) ("When responses are only signed by an attorney, and not by the client, the attorney has effectively been made a witness.").

the facts as true—as the Court must at summary judgment, if supported by competent evidence—Defendant is entitled to judgment as a matter of law that Plaintiff was not reasonably diligent.

Two-and-a-half inches is the diameter of a tennis ball. *See* International Tennis Federation, *ITF Rules of Tennis* 19 (2019) (in most contexts, tennis balls must be between 2.57 and 2.7 inches in diameter), *available at* https://www.itftennis.com/media/298557/298557.pdf (last accessed June 13, 2019). No reasonable property owner could fail to suspect damage from hail of that size, nor wait approximately twenty months (late June 2015 to February 2017) to *consider* inspecting the roof for hail damage.

Plaintiff asserts that hail damage to a polymer-modified bitumen roofing system "manifests itself in the form of faint, hairline cracks in a concentric, circular [pattern]." (ECF No. 69 at 21.) Thus, the damage may be hard to see without specifically looking for it, particularly when obscured by "alligatoring," which is the natural cracking that occurs to that kind of roof over time due to weathering. (*Id.*) But Plaintiff asserts as much to explain why roofing contractors it sent to the Property's roof in February and March 2016 (between the two hail storms) never reported hail damage. Plaintiff insists it was significant that those contractors were hired to address unrelated issues, and "[n]either [contractor was] asked to inspect the roof for hail damage." (*Id.* at 3, ¶ 5.) In other words, Plaintiff establishes only that contractors not asked to look for hail damage might not see it. Even accepting as much, there is no dispute that when Plaintiff asked a contractor (LR Contracting) to look for hail damage, the contractor quickly found it. Similarly, when Defendant's adjuster (Fossen) inspected the roof for hail damage, he

saw it immediately.  And both sides' experts appear to agree that the damage from the

June 2015 storm, if any, would have been visible immediately or soon after the storm

itself.  (*See* ECF No. 56-3 at 28–29; ECF No. 56-9 at 31.)  Indeed, one of Plaintiff's

experts concludes that damage from the June 2015 storm can be distinguished from

damage caused by the June 2016 storm, if any, because the "June 24, 2015 event was

more severe than the 2016 event."  (ECF No. 56-3 at 28.)

Because Plaintiff waited twenty months to arrange for a roof inspection after a

hail storm that brought two-and-a-half inch hail, a reasonable jury could only find that

Plaintiff failed in its objective duty of reasonable diligence.  Thus, Defendant is entitled

to summary judgment on at least this much.

**B.      Must Defendant Prove Prejudice from Plaintiff's Failure to Provide Prompt Notice?**

Defendant argues that failure to provide prompt notice, by itself, excuses it from

coverage under first-party property/casualty claims brought under HOA policies—as

compared to certain other types of claims, where the Colorado Supreme Court has held

that the insurer must prove prejudice from a lack of prompt notice.  (ECF No. 56 at 19–

21.)

The general rule in Colorado from the early 1900s has been that the insurer need

not prove prejudice to be excused from coverage when the insured failed to provide the

notice required under the policy.  *See Marez v. Dairyland Ins. Co.*, 638 P.2d 286, 288–

91 (Colo. 1981) (citing, among other things, *Barclay v. London Co.*, 105 P. 865 (Colo.

1909)).  In 2001, however, the Colorado Supreme Court began to loosen this doctrine in

its *Clementi* decision.  The court cited *Marez*, in particular, as embodying the "traditional

approach" to the question of late notice.  *Clementi*, 16 P.3d at 226–28.  The court held

that, in UIM coverage cases specifically, the traditional approach should be abandoned. *Id.* at 230 ("we are persuaded by the reasoning of courts that have joined the modern trend and conclude that insurer prejudice should now be considered when determining whether noncompliance with a UIM policy's notice requirements vitiates coverage"). The court reached this conclusion through "three policy justifications for departing from the traditional approach. These justifications can be generally described as follows: (1) the adhesive nature of insurance contracts, (2) the public policy objective of compensating tort victims, and (3) the inequity of the insurer receiving a windfall due to a technicality." *Id.* at 229. *Clementi* did not overrule *Marez*, however, because *Clementi* viewed *Marez* as a "no-notice liability [insurance] case," and therefore "inapplicable in determining whether insurer prejudice should be considered in the UIM late-notice case at bar." *Id.* at 228.

Four years later, the Colorado Supreme Court took on a portion of *Marez* directly. Specifically, in *Friedland v. Travelers Indemnity Co.*, 105 P.3d 639 (Colo. 2005), the court agreed to decide "whether the traditional late notice rule announced in *Marez* . . . should be overruled with respect to liability insurance policies." *Id.* at 641 n.1. Moreover, the court specifically considered whether it "should overrule *Marez* in whole or in part." *Id.* at 645; *see also id.* at 644 n.2 ("the parties before us have had the opportunity to argue . . . whether *Marez* should be overruled in whole or in part"). The court chose "in part." Applying the same three policy considerations articulated in *Clementi*, the court "overrule[d] *Marez* to the extent it applies to liability policies involving late notice." *Id.* at 645–46. Thus, under *Friedland*, an insurer must prove prejudice from late notice given under a liability policy. *Id.* at 647.

11

Ten years after *Friedland*, the Colorado Supreme Court returned to the notice-prejudice debate in *Craft v. Philadelphia Indemnity Insurance Co.*, 343 P.3d 951 (Colo. 2015). The policy at issue in *Craft* was a "claims-made" directors and officers liability policy. *Id.* at 953. As a claims-made policy, coverage extended only to claims reported within a specified timeframe, as opposed to an "occurrence" policy (such as in *Clementi* and *Friedland*, and here) where coverage extends to losses that occurred during the policy term, irrespective of when they were reported, so long as reported within a reasonable time under the circumstances. *Id.* at 952–53. The court held that notice-prejudice does not apply to claims-made policies, in part because of the special nature of claims-made policies and in part because the *Clementi* factors did not yield the same results. *Id.* at 957–61. In the process, it affirmed that *Friedland* "overruled *Marez* to the extent it applied to late-notice liability [insurance] cases." *Id.* at 956.[6]

This district has split on the question of whether, in light of *Clementi* and *Friedland*, the notice-prejudice rule applies to property/casualty insurance policies. For example, Judge Christine M. Arguello held in *Cherry Grove East II Condominium Association, Inc. v. Philadelphia Indemnity Insurance Co.*, 2017 WL 6945038 (D. Colo. Dec. 20, 2017), that *Clementi* and *Friedland* were addressed specifically to the types of insurance policies at issue there, and that *Marez* otherwise remained the law. *Id.* at *3–5. Judge Arguello further found that the three policy factors in *Clementi* did not counsel in favor of extending the notice-prejudice rule to first-party property/casualty claims. *Id.*

---

[6] Interestingly, *Craft* also stated that *Friedland* should not be interpreted to "mean that the notice-prejudice rule generally applies to all aspects of all liability policies." *Craft*, 343 P.3d at 960. This suggests that, even among the types of policies to which the notice-prejudice rule applies, the applicability of the notice-prejudice rule may nonetheless turn on the type of claim brought by the insured. Because no party makes an argument in this vein, the Court need not address it further.

at *5.  On the other hand, then-Chief Judge Marcia S. Krieger has disagreed with Judge

Arguello, holding in *Hiland Hills Townhouse Owners Association, Inc. v. Owners*

*Insurance Co.*, 2018 WL 4537192 (D. Colo. Sept. 20, 2018), that

> to the extent that *Friedland* [and its application of the three
> *Clementi* factors] does not already control the outcome here,
> this Court is persuaded that the Colorado Supreme Court's
> analysis in that case would yield the conclusion that the
> notice/prejudice rule is applicable in the first-party casualty
> insurance context as well.

*Id.* at *6.

Defendant argues that *Cherry Grove East* is the better-reason decision

compared to *Hiland Hills*.  The Court agrees that *Cherry Grove East*, to the extent it

relies on *Marez*'s continuing status as governing Colorado law, is the better-reasoned

decision.

The well-known rule of *Erie Railroad Co. v. Tompkins* is that a federal court

sitting in diversity applies "the law of the state" where it sits—meaning the law of the

state as "declared by its Legislature in a statute or by its highest court in a decision."

304 U.S. 64, 78 (1938).  "Where no controlling state decision exists, the federal court

must attempt to predict what the state's highest court would do."  *Wankier v. Crown*

*Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003).  Conversely, where a controlling state

decision *does* exist, the federal court must follow it.

But how strong is this rule, particularly when considering "old" case law?  The

U.S. Supreme Court approached this question, but never really answered it, in

*Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198 (1956).  There, the parties

entered into a contract with an arbitration clause, but the plaintiff sued in Vermont state

court.  *Id.* at 199.  The defendant removed to federal court on diversity grounds and

13

moved to stay the case in favor of arbitration. *Id.* The federal court in Vermont denied

the motion. It found that Vermont law applied to the enforceability of the arbitration

agreement, and that, under a Vermont Supreme Court decision from 1910, arbitration

agreements are voidable in Vermont any time before the arbitration award. *Id.* at 199–

200, 204. The U.S. Supreme Court acknowledged the decision's age but found that

factor irrelevant under the circumstances:

> [I]t was agreed on oral argument that there is no later
> authority from the Vermont courts, that no fracture in the
> rules announced in those cases has appeared in subsequent
> rulings or dicta, and that no legislative movement is under
> way in Vermont to change the result of those cases. Since
> the federal judge making those findings is from the Vermont
> bar, we give special weight to his statement of what the
> Vermont law is. We agree with him that if arbitration could
> not be compelled in the Vermont courts, it should not be
> compelled in the Federal District Court. Were the question
> in doubt or deserving further canvass, we would of course
> remand the case to the Court of Appeals to pass on this
> question of Vermont law. But, as we have indicated, there
> appears to be no confusion in the Vermont decisions, no
> developing line of authorities that casts a shadow over the
> established ones, no dicta, doubts or ambiguities in the
> opinions of Vermont judges on the question, no legislative
> development that promises to undermine the judicial rule.

*Id.* at 204–05 (citations omitted).

This appears to be an invitation for federal courts to predict that a state's highest

court would overrule a decision *and then treat it as if it has been overruled*, at least if the

federal judge sees a substantial reason to believe that it probably will be. But because

the circumstances did not present that possibility, the Supreme Court did not actually

say as much, and this Court doubts that it would go that far if squarely presented with

the question. To give federal courts power to decide that a state supreme court would

overrule the otherwise applicable decision would significantly jeopardize "the twin aims

14

of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws."  *Hanna v. Plumer*, 380 U.S. 460, 468 (1965); *see also Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 533 (1949) ("[T]he federal court must follow [the applicable state law].  Otherwise there is a different measure of the cause of action in one court than in the other, and the principle of *Erie R. Co. v. Tompkins* is transgressed.").

Indeed, in the Colorado judicial system, only the Colorado Supreme Court may overrule its decisions regarding Colorado law.  *See People v. Novotny*, 320 P.3d 1194, 1203 (Colo. 2014) (stating "we alone can overrule our prior precedents concerning matters of state law," and approvingly quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989), for the principle that, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions").  Thus, if this case had been brought in state court, the parties could properly argue over whether *Clementi* and *Friedland* had implicitly overruled *Marez*, but they could not properly ask the trial court (or Colorado Court of Appeals) to disregard *Marez* based on a *prediction* that the Colorado Supreme Court will eventually overrule it.  And if the parties may not make such an argument in state court, it should likewise be impermissible in federal court.  Otherwise, a highly significant question of substantive law (whether an insurer must prove prejudice from late notice) might be answered differently based solely on the difference between suing in state court or federal court.[7]

---

[7] Of course there may be situations where it is obvious that a state supreme court decision ("Decision A") has been completely undermined by later state supreme court decisions

15

Even if the discussion of Vermont law in *Bernhardt* somehow gives federal courts authority to prospectively overrule state supreme court holdings regarding state law, the Court would not exercise that authority against *Marez*, for three independent reasons.

First, Plaintiff has not argued that the *Bernhardt* considerations—"confusion in the [state court] decisions," "[a] developing line of authorities that casts a shadow over the established ones," "dicta, doubts or ambiguities in the opinions of [state court] judges on the question," or "legislative development that promises to undermine the judicial rule," 350 U.S. at 205—counsel in favor of treating *Marez* as overruled. Failure to make the argument amounts to forfeiture of that contention. *See, e.g.*, *United States v. Elliott*, 684 F. App'x 685, 687 (10th Cir. 2017).

Second, the only potentially applicable *Bernhardt* consideration is a "developing line of authorities"—*Clementi* and *Friedland*—that one might view as "cast[ing] a shadow over" *Marez*. *See Bernhardt*, 350 U.S. at 205. If *Clementi* was the Colorado Supreme Court's only recent word on *Marez*, the Court might agree that a substantial "shadow" had been cast, given *Clementi*'s apparent approach of limiting *Marez* to its "no-notice" facts. Then the question would be whether that is enough, on its own, to authorize a federal court to treat *Marez* as overruled. But *Clementi* is not the only word, or the most recent word. In *Friedland*, the Colorado Supreme Court explicitly asked itself whether it "should overrule *Marez* in whole or in part," and it explicitly limited itself to "overrul[ing] *Marez* to the extent it applies to liability policies involving late notice."

(*e.g.*, "Decision B" and "Decision C") although Decisions B and C simply seem unaware of Decision A. It may likewise be obvious that Decision A must necessarily yield to advancing *federal* law regarding, say, individual rights. A nineteenth-century state supreme court decision enforcing coverture, for example, might fit both scenarios, and there is likely no *Erie* problem for a federal court to disregard Decision A. There may be other exceptions as well. For the reasons stated in this order, whatever exceptions exist do not reach *Marez*.

105 P.3d at 645.[8]  *Craft* confirmed the scope of this ruling.  343 P.3d at 956.  Thus, the degree to which *Marez* has suffered a "fracture," *Bernhardt*, 350 U.S. at 205, is a matter over which the Colorado Supreme Court has chosen to exercise conscious control. Although *Clementi* and *Friedland* certainly raise questions about *Marez*, they also represent a choice to keep *Marez* in place for the time being, save to the limited degree announced in *Friedland*.  Consequently, there is no warrant for this Court to get ahead of the Colorado Supreme Court on this important issue.

Third, even if this Court could read *Clementi*, *Friedland*, and *Craft* as the Colorado Supreme Court's authorization to apply the three *Clementi* policy factors to *any* notice-prejudice question,[9] the Court could not, in these circumstances, hold that the *Clementi* factors counsel in favor of applying the notice-prejudice rule to first-party property/casualty claims.  This is so because Plaintiff's only argument in this regard— indeed, its only argument *either* on whether this Court has power to impose the notice-prejudice rule *or* on whether the case law would otherwise justify it—is a single sentence in its conclusion that lack of a prejudice requirement would create "the sort of 'windfall' that the notice/prejudice rule seeks to avoid."  (ECF No. 69 at 35 (citing *Hiland Hills*'s conclusion to this effect).)  This is only one of the three *Clementi* factors.  The other two are "the adhesive nature of insurance contracts" and "the public policy objective of compensating tort victims."  *Clementi*, 16 P.3d at 229.  Defendant argues

---

[8] For this reason, contrary to *Hiland Hills*, there is no "extent" to which *Friedland* "already control[s] the outcome here."  2018 WL 4537192, at *6.

[9] This is a highly doubtful reading.  The *Clementi* factors are the Colorado Supreme Court's test for deciding whether to depart from the traditional approach, *i.e.*, to overrule prior case law.  The Colorado Supreme Court's choice to impose an analytical constraint on the question of whether to overrule itself does not mean that the analytical constraint becomes a freestanding test for all courts to apply.

that these two factors do not apply to property/casualty policies, at least those

purchased by homeowners associations.  (ECF No. 56 at 20–21.)  The Court need not

fully agree with Defendant on this point because Plaintiff has not responded to the

argument and is therefore deemed to concede it.  Furthermore, Plaintiff has pointed to

no case, nor is the Court aware of any, demonstrating that the "windfall" factor alone is

enough to impose a notice-prejudice rule.

To be clear, the trend in Colorado, as in the nation, is toward imposing the

notice-prejudice rule.  The odds are probably better than even that the Colorado

Supreme Court will someday overrule *Marez* as to all or mostly all occurrence-based

policies.  But thus far the Colorado Supreme Court has consciously and affirmatively

avoided that outcome, and there is no sound basis for this Court to finish a job the

Colorado Supreme Court chose not to take up.

Following *Marez*, then, the Court holds that the notice-prejudice rule does not

apply in Colorado to first-party property/casualty claims brought under HOA policies.

Coverage is therefore excused in light of Plaintiff's unreasonably late notice, and

Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.[10]

## C.    Bad Faith & Unreasonable Delay/Denial Claims

Plaintiff has also alleged claims for common-law bad faith breach of insurance

contract and unreasonable delay or denial of insurance benefits under Colorado

Revised Statutes §§ 10-3-1115 and -1116.  (ECF No. 1 at 6–10.)  "Having concluded

---

[10] In *Sunflower*, the Court evaluated whether the defendant (also Owners) had proven prejudice after receiving late notice of hail damage under an HOA's property/casualty policy. *See* 2018 WL 2196089, at *6, *8–9.  But, for whatever reason, Owners chose not to argue in *Sunflower* that notice-prejudice is inapplicable.  Owners instead assumed that *Clementi* and *Friedland* established a notice-prejudice rule for property/casualty policies and then argued that such prejudice was established as a matter of law.  (*See* Civil Action No. 16-cv-2946, ECF No. 94 at 21–23 (D. Colo., Oct. 30, 2017).)

that [Defendant's] denial of coverage was proper as a matter of law," Plaintiff's other claims necessarily fail because there is no coverage Defendant was obligated to provide, and Defendant therefore could not have withheld coverage in bad faith or unreasonably. *See MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1192–93 (10th Cir. 2009). Defendant is entitled to summary judgment on these claims as well.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant's Motion for Summary Judgment (ECF No. 56) is GRANTED;

2. Defendant's Motion to Limit the Testimony of Howard Altschule Pursuant to F.R.E. 702 (ECF No. 80), as well as Plaintiff's Motions in *Limine* (ECF No. 91), are DENIED AS MOOT;

3. The Final Trial Preparation conference scheduled for July 8, 2019, and the five-day jury trial scheduled to begin on July 22, 2019, are both VACATED;

4. The Clerk shall enter judgment in favor of Defendant and against Plaintiff, and shall terminate this case; and

5. Defendant shall have its costs upon compliance with D.C.COLO.LCivR 54.1.

Dated this 18th day of June, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge